**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| **HARVEY STEWART, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CAUSE NO. 1:08-CV-00209** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Harvey Stewart, Jr., who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Stewart applied for DIB on October 5, 2004, alleging disability as of August 5, 2003; his date last insured for DIB was December 31, 2004. (Tr. 11, 52, 56.) The Commissioner denied Stewart's application initially and upon reconsideration, and Stewart requested an administrative hearing. (Tr. 35-37.) On April 11, 2007, Administrative Law Judge ("ALJ") Richard Ver Wiebe conducted a hearing at which Stewart, who was represented by counsel at the time, and Charles Howie, Stewart's treating mental health counselor, testified. (Tr. 288-311.) On November 20,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

2007, the ALJ rendered an unfavorable decision to Stewart, concluding that he was not disabled because despite the limitations caused by his impairments he could perform a significant number of light-work jobs in the economic region. (Tr. 11-19.) The Appeals Council denied Stewart's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-7.) Accordingly, Stewart filed a complaint with this Court on September 12, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)

This is Stewart's third application for DIB; he filed an initial application on December 22, 1999, which was denied by ALJ Dennis Kramer on August 24, 2001, and a second application on April 23, 2002, which was denied by ALJ Yvonne Stam on September 7, 2004. (Tr. 11.) Because ALJ Stam's decision was final and binding, *see* 20 C.F.R. § 404.955, the earliest he can be found disabled with regard to his current application is September 8, 2004, even though Stewart asserts an onset date of August 5, 2003. Furthermore, since Stewart's date last insured for DIB was December 31, 2004 (Tr. 52), he must show that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Therefore, Stewart's window of opportunity with respect to this appeal is quite narrow.

## II. STEWART'S ARGUMENTS

Stewart alleges essentially three flaws with the Commissioner's final decision. Specifically, he claims that the ALJ: (1) improperly concluded that he did not have a medically determinable mental impairment prior to his date last insured; (2) improperly evaluated the credibility of his testimony concerning his debilitating pain; and (3) erred by stating at the hearing that he was disabled but later denying him DIB in his written decision. (Docket # 15, 22.)

## III.  FACTUAL BACKGROUND[2]

*A. Background and Daily Activities*

As of December 31, 2004, his date last insured, Stewart was thirty-eight years old, had a high school education, and possessed work experience as a housekeeper and a maintenance worker. (Tr. 18, 52, 55-56, 62.)  Stewart stopped working in January 1999; he alleges that he became disabled due to bilateral shoulder pain, limited reading ability, summer pollen allergies, and depression. (Tr. 15, 55-56.)

At the hearing, Stewart testified that he lives with his wife and four children in a split-level home. (Tr. 292-93.)  Stewart, who is left-handed, stated that as of his date last insured he needed assistance to bathe and to comb his hair due to his left shoulder pain and limited range of motion, and that most days he does not bother to bathe or dress. (Tr. 299-300.)  He reported that he wears slip-on shoes because he cannot tie laces and that he has learned to sign his name with his right hand due to his left shoulder pain. (Tr. 294-95.)  He states that he does not leave his home except for appointments. (Tr. 301.)  He confided, however, that he does drive a car occasionally, though he tries to avoid traffic and bumpy roads due to his shoulder pain. (Tr. 303-04.)

When asked why he thought he could not work, Stewart answered: "The pain." (Tr. 293.)  He elaborated that his pain is centered on the left side of his neck and left shoulder, stating that surgery "took care of most of [his pain]" with respect to his right shoulder. (Tr. 293.)  He reported that he has good days and bad days with respect to his pain. (Tr. 298.)  When asked whether his condition was "worse or better or about the same" than what he had described to

---

[2] In the interest of brevity, this opinion recounts only the portions of the 311-page administrative record necessary to the decision.

ALJ Stam in 2004, Stewart responded: "Just pretty much the same thing." (Tr. 301.)

Stewart's mental health counselor, Charles Howie, also testified at the hearing on Stewart's behalf. (Tr. 306-10.) He reported that he started counseling Stewart in September 2005, nine months after his date last insured. (Tr. 307.) He testified, however, that "based on the history that Mr. Stewart gave [him]" and his observation of Stewart's affect, he believed that Stewart's depression started as early as 2001 or 2002 and that he had "no doubt" that the observations he opined in August 2006 were also accurate as of Stewart's date last insured. (Tr. 308-10.)

*B. Medical Evidence of Record Prior to Stewart's Date Last Insured*

In November 1997, Stewart fell and injured his left shoulder, and he required arthroscopic surgery, which was performed by Dr. Stephen Wright, an orthopaedic surgeon. (Tr. 79, 159.) Two years later, in June 1999, Dr. Wright performed a second arthroscopic procedure on Stewart's left shoulder. (Tr. 79, 159.)

Between February 2002 and January 2003, Stewart saw Dr. Bhupendra Shah, a neurologist, four times for pain in the left side of his neck and left shoulder, which occasionally traveled down into his left arm and caused numbness and tingling in his fingers. (Tr. 159-60.) Upon physical examination, Stewart exhibited normal muscle strength in his right upper extremity; however, the movement of his left arm was limited in range of motion and guarded due to pain. (Tr. 160.) He also exhibited decreased grip strength of his left hand, some decreased sensation in his left arm, and tenderness to touch in his left shoulder. (Tr. 160.) The results of a nerve conduction study, however, were within normal limits. (Tr. 156.) Dr. Shah prescribed various medications and eventually sent him to Dr. Wright for a follow-up evaluation. (Tr. 152.)

4

In February 2003, Dr. Wright evaluated Stewart. (Tr. 108.) On physical examination, Stewart exhibited reduced range of motion, strength, and sensation in his left arm, but "decent grip strength." (Tr. 108.) Dr. Wright was "perplexed" as to why Stewart was still having pain and what course of action to take, since Stewart was already on medication and had already undergone several surgeries, nerve blocks, and physical therapy. (Tr. 108.)

In April 2003, Stewart returned to Dr. Shah, who encouraged him to continue his various medications. (Tr. 151.) Three months later, Dr. Shah observed Stewart's continued pain and decreased range of motion and sensation, instructed him to continue his medication, and referred him to Indiana University Medical Center Orthopedic Clinic. (Tr. 150.)

In July 2003, Stewart was evaluated by Dr. Stephen Trippel at the Indiana University Medical Center. (Tr. 79-80.) He noted that Stewart's left hand was discolored, that his sensation was diminished over the left upper extremity, and that his range of motion was reduced on the left. (Tr. 80.) He thought Stewart's symptoms were suggestive of neurological etiology, possibly reflex sympathetic dystrophy, and recommended that he work on pain management and recovering function. (Tr. 80.)

Stewart visited Dr. Shah again in August 2003, for complaints of earaches and continued left shoulder pain. (Tr. 149.) After hearing Stewart's report of his visit to the Medical Center, Dr. Shah referred him to Dr. David Bojrab for pain management and encouraged him to continue his various medications. (Tr. 149.)

On September 18, 2003, Stewart was evaluated by Dr. Bojrab of Pain Management Associates, P.C. (Tr. 82.) He described his pain as a "seven" on a scale of one-to-ten but stated that at times it is "unbearable." (Tr. 82.) Dr. Bojrab recommended that Stewart undergo

5

sympathetic nerve blocks. (Tr. 83.)

Stewart next visited Dr. Shah on March 23, 2004, complaining of not only left shoulder pain but also right shoulder pain. (Tr. 148.) Dr. Shah referred Stewart to Dr. Wright for his right shoulder pain and also recommended that he get an EMG and nerve conduction study, the results of which were within normal limits. (Tr. 147-48.)

Stewart saw Dr. Wright on March 26, 2004, and he diagnosed him with right rotator cuff and bicipital long head tendonitis. (Tr. 119-20.) He gave Stewart an injection in his right shoulder and recommended that he perform certain shoulder exercises. (Tr. 120.)

On May 15, 2004, Stewart returned to Dr. Wright following an MRI scan. (Tr. 118.) Dr. Wright diagnosed him with right partial thickness rotator cuff tear and scheduled him for a surgical repair. (Tr. 118.) Two months after surgery, Stewart was "doing well" and continuing his exercises. (Tr. 115.)

On November 10, 2004, R. Klion, Ph.D., a state agency psychologist, reviewed Stewart's record and completed a Psychiatric Review Technique form, concluding that Stewart had no medically determinable mental impairment. (Tr. 128-40.) In doing so, Dr. Klion noted that Stewart claimed a low reading level but that he had a high school education, was not in special education, and had a long work history. (Tr. 140.) His opinion was affirmed on February 17, 2005, by D. Unversaw, Ph.D., a second state agency psychologist. (Tr. 140.)

The next day, Dr. A. Lopez a state agency physician, reviewed Stewart's record and completed a Physical Residual Functional Capacity Assessment. (Tr. 163-70.) He concluded that Stewart could perform medium work – that is, frequently lift twenty-five pounds and occasionally lift fifty pounds, stand or walk for about six hours in an eight-hour workday, sit for

6

about six hours in an eight-hour workday, push or pull without limitation, and required no postural or manipulative limitations. (165-66.) His opinion was later affirmed by a second state agency physician. (Tr. 170.)

On December 7, 2004, Stewart visited Dr. Shah, explaining that a few days earlier he had lifted a heavy object weighing about seventy-five to eighty pounds and "felt something pop" in his left shoulder. (Tr. 145.) He stated that prior to this incident he had been "doing well" with both shoulders. (Tr. 145.) Dr. Shah noted that Stewart had limited range of motion of his left shoulder due to pain and mild tenderness in his cervical region. (Tr. 145.) Dr. Shah encouraged him to continue his medication and to return to Dr. Wright for his left shoulder pain. (Tr. 145.)

*C. Medical Evidence of Record After Stewart's Date Last Insured*

Stewart returned to Dr. Shah in January 2005, complaining of pain in his neck and headaches over the past year. (Tr. 144.) He reported, however, that "his severe shoulder pain [wa]s gone." (Tr. 144.) A neurological examination was unremarkable except for decreased sensation to pinprick in Stewart's left arm and mild tenderness in his cervical region. (Tr. 144.) He recommended an MRI and that Stewart continue to take his medication. (Tr. 144.)

Stewart visited Dr. Shah again on June 7, 2005, reporting that he was doing better as far as his headaches were concerned since he had tubes put in his ears. (Tr. 250; *see* Tr. 185, 187.) His neurological examination was unremarkable except for mild to moderate tenderness in the cervical region and decreased response to pinprick in his left arm. (Tr. 250.) Dr. Shah adjusted Stewart's medication. (Tr. 250.)

From July 2005 to March 2006, Stewart was evaluated and treated by Dr. Frank Shao of Parkview Behavioral Health. (Tr. 224-35.) He diagnosed him with dysthymia and prescribed an

7

antidepressant. (Tr. 226.)

On August 8, 2005, Stewart reported to Dr. Shah that he was "doing pretty well." (Tr. 248.) He explained that the cortisone shots and lifting restrictions that Dr. Wright prescribed – that is, "not to lift anything heavy" – were effective, that he was sleeping well, that his headaches were "better controlled", and that his medication was "helping him a great deal." (Tr. 248.) His neurological examination was the same as in the past, and he was encouraged to continue his medication. (Tr. 248.)

From September 2005 through August 2006, Stewart received mental health counseling approximately twice a month from mental health counselor Chuck Howie. (Tr. 238-42, 282-87.)

On November 8, 2005, Stewart visited Dr. Shah, explaining that his headaches had gone away since starting allergy shots and that he was stable other than having tremors in his left hand. (Tr. 246.) Dr. Shah noted limitation of movement in his left shoulder, decreased sensation in his left arm, and mild tremors of his left hand; his coordination, however, was normal. (Tr. 245-46.) He adjusted Stewart's medication. (Tr. 246.)

On June 9, 2006, Stewart returned to Dr. Wright, complaining of continuous right shoulder pain at a level "eight" for the last month and a half. (Tr. 270-71.) He reported that his pain worsened with overhead reaching, but that it does not wake him up at night; he stated that he takes Neurontin twice a day and "occasionally" takes Celebrex. (Tr. 271.) Upon examination, Stewart's range of motion was 160 degrees forward elevation, 40 degrees external rotation with his arm at his side, and 60 degrees external and internal rotation with his arm abducted; his strength on right/left with forward elevation was 5/4+, abduction 5/4+, and external and internal rotation 5/5. (Tr. 271.) Dr. Wright noted tenderness over the long head of the biceps tendon

anteriorly. (Tr. 271.). He diagnosed Stewart with right long head bicipital tendonitis, gave him an injection in the biceps tendon, instructed him to resume his exercises, and to return to see him as needed. (Tr. 271.)

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

*Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## B. The ALJ's Decision

On November 20, 2007, the ALJ rendered his opinion. (Tr. 11-19.) He found at step one of the five-step analysis that Stewart had not engaged in substantial gainful activity from his onset date through his date last insured, December 31, 2004. (Tr. 14.) At step two, the ALJ concluded that Stewart's bilateral shoulder pain was severe but that he had no medically determinable mental impairment as of his date last insured. (Tr. 14.) At step three, he determined that Stewart's impairments were not severe enough to meet a listing. (Tr. 15.) Before proceeding to step four, the ALJ determined that Stewart's testimony concerning the intensity, persistence, and limiting effects of his symptoms was "not entirely credible," and assigned him an RFC of "the full range of light work" as of his date last insured. (Tr. 16.)

Based on this RFC, the ALJ concluded at step four that Stewart could not perform his past relevant work. (Tr. 18.) The ALJ then proceeded to step five where he determined that, considering his age, education, and experience, and in reliance on the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2, Stewart could have performed a significant number of light-work jobs within the economic region as of his date last insured. (Tr. 18.) Therefore, Stewart's claim for DIB was denied. (Tr. 19.)

*C. Substantial Evidence Supports the ALJ's Conclusion That Stewart Did Not Have a Medically Determinable Mental Impairment Prior to His Date Last Insured*

Stewart argues that the ALJ lacked the support of substantial evidence when he found that Stewart did not have a medically determinable mental impairment prior to his date last insured. This argument does not warrant a remand of the Commissioner's final decision.

To explain, in reaching his determination, the ALJ relied upon the opinions of the state agency psychologists, who specifically opined that there was no evidence that Stewart had a medically determinable mental impairment prior to his date last insured. (Tr. 15); *see* 20 C.F.R. § 404.1527(f); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (stating that an ALJ "may properly rely upon the opinion of [state agency physicians]"). The ALJ also considered the fact that Stewart had not received any significant mental health treatment prior to his date last insured. (Tr. 15); *see id*. ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); *Spyratos v. Sullivan*, No. 90 C 3861, 1992 WL 249598, at *11 (N.D. Ill. Sept. 25, 1992) ("A claimant bears the responsibility of providing medical evidence of a mental impairment." (citing 20 C.F.R. § 404.1514)).

And, while the ALJ acknowledged that Stewart did visit Dr. Shao, a psychiatrist, six months after his date last insured, and mental health counselor Howie nine months after his date last insured, he emphasized that Mr. Howie's August 2006 opinion speaks only to Stewart's current condition and makes no attempt to opine about his mental health condition in 2004. (Tr. 15); *see Wright v. Astrue*, No. 08-cv-231-bbc, 2008 WL 4829950, at *11 (W.D. Wis. Oct. 27, 2008) (affirming the ALJ's rejection of certain medical opinions where they postdated the claimant's date last insured and assessed limitations only as to the claimant's current condition). And, though Dr. Shao's notes record Stewart's subjective statement that he had been feeling

11

depressed for three years prior to his initial visit, his notes too speak only to Stewart's current condition, expressing no clinical opinion as to the onset of Stewart's depression. (Tr. 226-36.)

Furthermore, the ALJ represented that he "carefully considered" Mr. Howie's testimony at the hearing that he thought Stewart was depressed prior to his date last insured. (Tr. 15.) Yet, the ALJ reasonably concluded that Mr. Howie's testimony was not enough to overcome the void of contemporaneous objective medical evidence concerning Stewart's mental health prior to his date last insured and the state agency psychologists' opinion that Stewart had no medically determinable mental impairment. *See Anderson v. Sullivan*, 925 F.2d 220, 222-23 (7th Cir. 1991) (stating that the ALJ is entitled to give more weight to contemporaneous medical evidence than to medical opinions based on hindsight); *Spyratos*, 1992 WL 249598, at *11 (discounting a post-insured physician's opinion that attempted to relate claimant's depression back to the insured period where the opinion was not supported by contemporaneous medical records); *see generally Scheck*, 357 F.3d at 702 ("[I]t is not unheard of that a [treating provider] might have been leaning over backwards to support the application for disability benefits." (citation and quotation marks omitted)).

It is the ALJ's responsibility, not the Court's, to resolve conflicts in the medical evidence, and here the ALJ adequately did so. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (stating that the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner"). The Court will not fall prey to Stewart's invitation to reweigh the evidence of record. *See id.* ("[The Court's] task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.").

The ALJ's conclusion that Stewart did not have a medically determinable mental impairment prior to his date last insured is supported by substantial evidence.

### D. Substantial Evidence Also Supports the Credibility Determination and RFC Assigned by the ALJ

Next, Stewart challenges the credibility determination and RFC assigned by the ALJ in asserting that his "constant physical pain" prevents him from performing competitive employment. Stewart's second challenge to the ALJ's opinion is also unavailing.

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(e); SSR 96-5p. The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. § 404.1545. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").

Here, the ALJ concluded that as of his date last insured Stewart had the exertional RFC to perform light work, which requires the ability to lift ten pounds frequently and twenty pounds occasionally and stand or walk six hours out of an eight-hour workday. *See* SSR 83-10. This RFC assigned by the ALJ is *more accommodating* than the limitations opined by the state agency physicians, who concluded in November 2004 that Stewart could perform medium work

13

requiring the ability to frequently lift twenty-five pounds and occasionally lift fifty pounds; stand or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday, and push or pull without limitation. *See* SSR 83-10. And, the RFC assigned by the ALJ is also *more restrictive* than the rather vague limitations assigned by Stewart's treating physicians in their clinical notes from time to time, which simply was to avoid heavy lifting. (*See, e.g.,* Tr. 280.)

And, the ALJ properly considered other evidence as well when determining Stewart's RFC, such as the treatment that he underwent during the relevant period. *See* 20 C.F.R. § 404.1545 (instructing the ALJ to consider *all* of the relevant evidence in the case record when assessing a claimant's RFC). In that regard, the ALJ noted that Stewart had received only conservative treatment during the latter part of 2004. (Tr. 17); *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative").

Of course, when assessing Stewart's RFC, the ALJ also determined the credibility of Stewart's testimony of debilitating limitations, concluding that he was "not entirely credible." (Tr. 16); *see Scheck*, 357 F.3d at 701 (explaining that making a credibility determination is inherent in an ALJ's RFC assessment). Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld

unless it is "patently wrong." *Powers*, 207 F.3d at 435.

In reaching his credibility determination, the ALJ noted that the objective medical evidence during the relevant period does not support the severity of Stewart's subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3); *Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *4 (S.D. Ind. June 15, 2006) (explaining that the lack of objective medical evidence is one factor to be considered by the ALJ when making his credibility determination). In that regard, the ALJ specifically pointed to Dr. Wright's and Dr. Shah's notes from August 2004 that indicated that Stewart was "doing well" and had good strength. (Tr. 17, 99, 116, 178.) The ALJ found these objective findings inconsistent with Stewart's testimony that he needed help to shave and bathe during the relevant period. (Tr. 17.) The ALJ further noted that by December 2004, Stewart apparently felt well enough to lift a couch that weighed between seventy-five and eighty pounds, ultimately causing a flare-up of his pain. (Tr. 17, 145.)

The ALJ further explained that the objective medical evidence does not support Stewart's testimony concerning the severity of fatigue he experiences after he receives an allergy shot. (Tr. 17.) Stewart testified that an allergy injection "puts [him] in a bad situation because it makes [him] real sleepy real quick" and that this persists "for a couple of days." (Tr. 303.) Yet, the physician's notes reflect that Stewart experienced fatigue only on the day he receives an injection, and furthermore, that by May 2005 he was tolerating them "much better" and felt only "a little sleepy after the shot."[4] (Tr. 197-200.) And, as discussed *supra*, the ALJ also considered in his credibility determination the fact that Stewart had received only conservative treatment

---

[4] Furthermore, while Stewart contends that his pain can be managed only by "a level of medication that makes it unsafe to sustain employment" (Docket # 22), he fails to point to any contemporaneous objective evidence of record to support this assertion. Nor did the Court note any such evidence in its own review of the record.

15

during the relevant period. (Tr. 17); *see* 20 C.F.R. § 404.1529; SSR 96-7p (explaining that a claimant's treatment measures is a factor that the ALJ should consider when determining a claimant's credibility).

In short, the ALJ adequately articulated his reasoning for his determination that Stewart's testimony of debilitating limitations during the relevant period was "not entirely credible", and his determination is not "patently wrong." *Powers*, 207 F.3d at 435. And, after determining Stewart's credibility, the ALJ arrived at an RFC that is supported by substantial evidence of record. *See* 20 C.F.R. § 404.1527(e)(1) (articulating that the final responsibility for deciding the claimant's RFC and whether he is disabled is "reserved to the Commissioner"). Then, considering Stewart's age, education, and experience, the ALJ properly applied this RFC under the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2, and determined that Stewart was not disabled because he could perform a significant number of light-work jobs within the economic region.

Therefore, because the ALJ's decision is supported by substantial evidence and does not contain legal error, it will be affirmed.

### E. Substantial Evidence Supports the ALJ's Conclusion that Stewart Was Not Disabled as of His Date Last Insured

Finally, Stewart contends that at the hearing the ALJ "clearly stated that [he] was disabled" and that the ALJ "further stated that the only issue was determining at what date to start the disability." (Docket # 15.) According to Stewart, the award of DIB is warranted because "it has been determined by a judge that [he] is disabled." (Docket # 15.)

At the beginning of the hearing the ALJ stated: "Now, it would appear certainly based on . . . all the recent medical records that we could find you disabled at this point or/and certainly as

16

of last December, the question is how far back we can go in finding that you could do no work."
(Tr. 290.) Thus, the ALJ did indeed suggest to Stewart at the hearing that he would find him *currently* disabled if that were the issue. *See Campbell v. Chater*, 932 F. Supp. 1072 (N.D. Ill. 1996) (finding that a "formal finding" of disability was not required in the ALJ's decision where the ALJ stated during the hearing that he would find the claimant currently disabled if that were the issue).

However, the ALJ thoroughly explained to Stewart that he must show that he was disabled *as of his date last insured*, not as of the date of the hearing. (*See* Tr. 290-92, 295, 297, 299, 307-08); *see generally Stevenson*, 105 F.3d at 1154 (explaining that a claimant must establish that he is disabled as of his date last insured in order to recover DIB). Ultimately, the ALJ determined that the medical evidence of record, discussed in detail *supra*, was inconsistent with an onset date prior to Stewart's date last insured. *See* SSR 83-20; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 353 (7th Cir. 2005); *Campbell*, 932 F. Supp. at 1076 (stating that "the onset date can never be inconsistent with the medical evidence of record" (citation omitted)). As concluded *supra*, the medical documentation from 2004 adequately supports the ALJ's conclusion that Stewart was not disabled prior to December 31, 2004, and thus Stewart's third argument is also unavailing.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Stewart.

SO ORDERED.

Enter for this 23rd day of June, 2009.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge